Filed 4/30/14  P. v. Carter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARY ANTHONY CARTER,<br><br>    Defendant and Appellant. | A138720<br><br>(Contra Costa County<br>Super. Ct. No. 51113265) |

Gary Anthony Carter was convicted of three counts of committing a lewd act upon two victims under the age of 14 (Pen. Code,[1] § 288, subd. (a)); nine counts of forcible rape of one of the victims (§ 261, subd. (a)(2)); one count of forcible oral copulation (§ 288a, subd. (c)(2)); and one count of violating a restraining order (§ 166, subd. (a)(4)). The trial court sentenced Carter to an aggregate prison term of 110 years to life and ordered that Carter pay $600,000 in noneconomic damages to one of the victims and $100,000 to the other.

Carter contends that the court prejudicially erred when it admitted evidence pursuant to Evidence Code section 1108; that Evidence Code section 1108 violates his due process rights; and that the award of $600,000 in noneconomic damages was an abuse of discretion because the court based that award on behavior that was not chargeable under section 288.

---

[1]  Unless otherwise indicated, statutory references are to the Penal Code.

1

We find no merit in Carter's arguments and affirm the judgment and the award of noneconomic damages.

## BACKGROUND

### I. *Procedural Background*

In an amended information,[2] the People charged Carter with 14 counts:  Counts 1 and 2, commission of a lewd act upon Jane Doe (Jane 1), a child under age 14 (§ 288, subd. (a)); counts 3 and 4, forcible rape of Jane 1 (§ 261, subd. (a)(2)); count 5, forcible oral copulation with Jane 1 (§ 288a, subd. (c)(2)); counts 6 through 12, forcible rape of Jane 1 (§ 261, subd. (a)(2)); count 13, misdemeanor violation of a restraining order (§166, subd. (a)(4)); and count 14, commission of a lewd act upon Jane Doe 2 (Jane 2), a child under age 14 (§ 288, subd. (a)).  Accompanying count 1, the information alleged that Carter was ineligible for parole, pursuant to section 1203.066, subdivision (a)(8).  Counts 3 through 9 and 12 were accompanied by the allegation that Carter was ineligible for parole, pursuant to section 1203.065, subdivision (a).  Counts 1 and 14 were accompanied by a sentence fixing allegation, pursuant to section 667.61, subdivisions (a)-(e).

A trial by jury commenced on December 6, 2012.  Presentation of evidence began on December 13, 2012.  The jury began its deliberation on December 19, 2012, and delivered a verdict in less than four hours.  The jury found Carter guilty on all counts and delivered the special findings, attendant on counts 1, 2, and 14, that the offenses were committed against more than one victim.  The jury also returned the special finding, attendant on count 1, that Carter had substantial sexual conduct with the victim.

Carter moved for a new trial on February 2, 2013.  The court denied the motion on March 13, 2013.

---

[2]  The original complaint, filed on May 4, 2011, charged Carter with 10 counts.  Following a preliminary hearing, held on August 23, 2011, the People filed an information charging Carter with 14 counts on September 7, 2011.  On December 5, 2012, the People moved to amend the information to conform to the proof expected at trial.  Carter opposed the motion.  The court granted the motion on December 10, 2010, and the amended information was filed that day.

On March 13, 2013, the court sentenced Carter to state prison for an aggregate term of 110 years to life as follows: (1) 15 years to life on counts 1 and 2, to be served consecutively; (2) 15 years to life on count 14, to be served concurrently with the sentence on count 1; and (3) 8 years each on counts 3 through 12, to be served consecutively with each other and with the sentences imposed on counts 1 and 2.

At a separate contested hearing on March 29, 2013, the court ordered Carter to pay restitution for noneconomic damages to Jane 1 in the amount of $600,000 and to Jane 2 in the amount of $100,000.

Carter filed a timely notice of appeal on May 10, 2013.

## II. *Factual Background*

### A. *Jane 1's Testimony*

Jane 1 was born in February 1994. Her parents divorced when she was four years old. From the ages of four to eight, Jane 1 lived with her grandparents and did not see her mother.[3] At eight years of age, she began living with her father and her stepmother. Also at age eight, Jane 1 began to see her mother again. At age 11 or 12, she began spending one or two nights on weekends at her mother's home. Carter lived with Jane 1's mother, and they had a daughter, Amber, who is nine years younger than Jane 1. Jane 1 has a sister, Jane 2, who is three years younger.

When Jane 1 was 12 or 13 years old, her weekend visits to her mother's home were to a house in Antioch, California. In that house, Carter and Jane 1's mother shared a bedroom, Amber had a bedroom, and Jane 1 and Jane 2 slept on the couch. During this time, Carter began sending Jane 1 daily text messages saying he loved her, that she was beautiful, or that he missed her. At some point, he began calling Jane 1 "baby" or "babe" or "wife" in his text messages.

Face-to-face, Carter would ask Jane 1 personal questions. When she was 12 years old, Carter asked her if she shaved. If Jane 1 didn't want to answer such questions, Carter told her that she had to. When Jane 1 was 12 years old, she came out of the

---

[3] The record does not indicate whether the grandparents with whom Jane 1 lived were her maternal or her paternal grandparents.

bathroom and Carter put her on his bed, pulled her pants down, and touched her vagina with his hand.

Carter started to kiss Jane 1 when she was 12 years old, first on the cheek, then on the lips, and then with his tongue in her mouth. Also about this time, Carter sometimes put his hand on Jane 1's inner thigh while he was driving or they were sitting on the couch. When they were on the couch he put a blanket over them so no one could see his hand.

Carter would "continuously" ask Jane 1 if she were a virgin. He told her that he liked virgins and that she "should have sex with an older man because he knows what [he is] doing."

Between the ages of 14 and 16, Carter and Jane 1's mother lived at a house in Concord, California. At this house, Carter had a bedroom upstairs and Jane 1's mother had a bedroom downstairs. Carter's touching of Jane 1 continued as before. One night Carter asked Jane 1 if "something was going on" between her and his son, Travis. Jane 1 denied involvement with Travis, but Carter didn't believe her and pushed her so that she hit a mirror hanging on the wall and then went to the floor. Carter took her pants off and penetrated her vagina with his penis. Jane 1 was 14 years old and in the seventh grade.

A couple of months later, Carter had intercourse with Jane 1 again, this time in his bedroom with the door locked. After that, Carter had intercourse with Jane every weekend she visited. Carter made Jane 1 sleep in his bedroom and told her to call him "Daddy." He told her he loved her "[a]ll the time."

Carter and Jane 1's mother next moved to a second house in Concord, where they again had separate bedrooms. Jane 1 was 16 to 17 years old when she visited this house. Carter continued to have sex with Jane 1 every weekend. He also put his mouth on her vagina at least three times.

Carter gave two rings to Jane 1. He told her that one was a "promise ring, to not tell on him and to be with him" and the other was an engagement ring. Jane 1 wore the rings only at Carter's house and knew she would "get in trouble" if she did not wear them there. Carter called Jane 1 his wife in front of everyone, including strangers and his

4

family. Carter told Jane 1 that she was going to be with him for the rest of her life, so she was not allowed to talk to boys or have male friends.

Jane 1 was scared of Carter and did as he asked because she "just didn't know what was going to happen." She saw Carter shove her mother and yell at her. Carter would fight with another son, Gary Carter, Junior (Junior), and on one occasion Jane 1 saw Carter use a taser gun on Junior. Jane 1 believed that if she did not have sex with Carter, he would turn his attentions to Jane 2 or Amber.

In April 2011, nine months before she turned 18, Carter had sex with Jane 1 without using a condom. Carter told her that when she turned 18 he would marry her, they would have a baby, and she would not be able to contact her family. Soon after this, Jane 1 called the police and reported what had been happening to her.

**B. *Jane 2's Testimony***

Jane 2 did not like Carter. She thought he was mean because he would slap her mother. She saw Carter taser Junior and saw him push Jane 1 into a mirror, causing her to hit her head on the fireplace. Carter would also slap Jane 1. Carter pointed his taser gun at her once or twice.

When Jane 2 was between 9 and 11, Carter put his hand on her inner thigh a few times, sometimes softly rubbing it. This happened in the living room while they were on the couch watching television. Jane 2 was scared and started avoiding Carter. Carter asked her for hugs and when hugging would lean in for a kiss, but Jane 2 would turn her head so that Carter only kissed her on the cheek. Sometimes Carter brushed her buttocks with his hand or told her that she looked good in the clothes she was wearing.

Jane 2 testified that Carter "would always call [Jane 1] his wife." Carter made Jane 1 go everywhere with him and he made Jane 1 sleep in his locked bedroom.

**C. *Megan Burke's Testimony***

Megan Burke, a friend of Jane 1, testified about an incident that occurred at Carter's house in the summer of 2010. Burke, Jane 1, and Carter went to a late-night bowling event together. Carter provided them with alcohol before they bowled and afterwards they returned to Carter's house and went to his bedroom to watch a movie and

5

drink more. While they were on the bed watching the movie, Carter kissed Jane 1 on the mouth. Carter then asked Burke to kiss him, saying that she should be experienced because when she had a boyfriend "he wouldn't leave [her] because [she] didn't know what [she] was doing." Carter put his arm around Burke, but she refused to kiss him and Carter became angry and left the room. Burke came to understand that she was expected to sleep in the bed with Carter and Jane 1, but she slept on the floor instead. Burke was uncomfortable and scared.

A couple of days after this incident, Carter began to send Burke text messages on an hourly basis. He told her to tell him everything she was doing, and to text him every morning and night. Carter threatened that if Burke did not comply, she could no longer be Jane 1's friend. Among the text messages, Carter "said he was very experienced and that he would be a good person to show me how to do everything right." Carter's text messages continued for at least a couple of months.

## D. *Uncharged Offenses*

Helen Y., age 39 at trial, met Carter when she was 16 and he was 28. Helen and Carter began dating about two months after meeting and Carter knew her age and that she was a high school junior in Martinez, California.

Helen began having sexual intercourse with Carter when she was 17. She left home when she was 17, became pregnant, married Carter, and had a baby, Junior. They lived together at a complex of small studio apartments in Martinez.

While Helen was pregnant, she saw Carter and her younger friend, Priscilla, lying together in bed at the studio apartment, fully clothed but asleep. Priscilla, who was in the ninth grade, had run away from home. Helen went inside and saw an unrolled condom in the bathroom toilet.

Helen left Carter when she was 21.

## E. *Violation of the Restraining Order*

After Jane 1 called the police, Carter was served with a restraining order that prohibited him from having any contact with Jane 1. On April 29, 2011, Jane 1's father answered a phone call at his house and heard a male voice ask for Jane 1. The caller

6

identification showed that the call came from Carter's phone and Jane 1's father recognized the voice as Carter's.

Jane 1's father called the police. A police officer who responded to the call saw Jane 1 crying hysterically.

## F. *Child Sexual Abuse Accommodation Syndrome*

Dr. James B. Carpenter, a physician specializing in pediatrics, testified as an expert on child sexual abuse accommodation syndrome and on child abuse in general. Carpenter testified to the constellation of reactions that children sometimes have in response to sexual abuse. Children may feel helpless to do anything about the abuse for a number of reasons, including fear and shame. Children may go from feeling helpless and entrapped to an accommodation or adjustment with the situation. Accommodation may involve denial or disassociation.

The child abuser works to keep the abuse secret in many ways, which may include threats of harm to the child or other family members. Violence against others in the family may be understood by the child as an implied personal threat.

The abuser may groom the victim by starting physical touching with fun and pleasurable games, such as tickling. The touching later becomes gradually more intimate.

## G. *The Defense*

Junior was the sole witness for the defense. He lived with Carter until he was 8 or 9 years old and then lived with his mother, visiting Carter on weekends. Junior's weekend visits with Carter coincided with the weekend visits of Jane 1 and Jane 2 for a period that is unclear in the record.

Junior testified that Jane 1 would sleep in Carter's room with the door closed. He knew that Carter called Jane 1 his wife because Jane 1's number on Carter's cell phone was identified as "wifey." Junior was "nosy" and would often put his ear to the door of Carter's room, but never heard any activity between Carter and Jane 1. He never observed inappropriate behavior between Carter and Jane 1 or Jane 2.

Junior never saw Carter act in a violent way toward anyone in the household. Carter had a taser because he worked as a security guard, but Carter did not intentionally taser him. Instead, he and Carter were "playing around" and he accidentally "stepped forward and ran into" the taser.

## DISCUSSION

### I. *Evidence Code 1108*

Carter maintains that the trial court abused its discretion when it allowed the prosecution to present evidence of prior uncharged sexual offenses against Helen and her friend Priscilla, pursuant to Evidence Code section 1108.[4]

### A. *Legal Standard*

Evidence Code section 1101, subdivision (a), generally prohibits use of uncharged acts by a defendant to prove propensity to commit the charged acts: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Evidence Code section 1108, subdivision (a), provides an exception to the general rule: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

"A challenge to admission of prior sexual misconduct under Evidence Code sections 1108 and 352 is reviewed under the deferential abuse of discretion standard and

---

[4] Carter also maintains that Evidence Code section 1108 violates his federal constitutional right to due process. Carter raises this issue to preserve it for federal review and understands that we are bound by the California Supreme Court's determination that Evidence Code section 1108 does not violate due process rights. (*People v. Falsetta* (1999) 21 Cal.4th 903, 907 (*Falsetta*).) Accordingly, we do not address the issue.

8

will be reversed 'only if the court's ruling was "arbitrary, whimsical, or capricious as a matter of law." ' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

When a court considers whether evidence of prior sexual misconduct is unduly prejudicial under Evidence Code section 352, the court "must engage in a careful weighing process . . . . Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . ." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

## B. *Background*

Prior to trial, the People submitted a motion in limine seeking to admit Helen's testimony under Evidence Code section 1108. Carter opposed the motion.

The court considered the motion on December 12, 2012, and noted that cases cited by the People "are two in a long line of cases that allow quite old evidence of sexual offenses to be admitted on the issue of propensity. And in—it does make sense that if there's a propensity then the passage of time is not particularly necessarily relevant to the propensity. What the cases do seem to say, though, is that although there's not a need for similarity under [Evidence Code section] 1108, the more dissimilar the evidence . . . the less probative it is and, therefore, in the balancing against the passage of time it's relevant in that respect."

Regarding Helen's own experience with Carter, the court continued: "So the fact that it's not—that they're not very similar, that there's no violence alleged as to [Helen], is not disqualifying under [Evidence Code section] 1108 but it does factor into the remoteness in time. However, I think that in this case there are significant similarities between the conduct with respect to [Helen] and the conduct alleged as to the complaining witnesses in this case. In both cases there was a large age difference. Granted it's a larger age difference now, but the difference between 28 and 16 is pretty

9

significant. It's not de minimus like she was 16 and he was 18. He was substantially older than [Helen] at the time.

"It also reflects that he was willing to violate the law with somebody substantially younger and too young to legally consent in both the cases, both [Helen] and the cases of the complaining witnesses here. There also is the evidence that when—after a period of time with [Helen] he got her pregnant and then wanted to get [Jane 1] pregnant in this case when she reached about the same age. And, again, I think it does indicate a propensity to be sexually involved with underage girls and then to keep them attached to him by getting them pregnant.

"And then—there's a control . . . [¶] . . . [¶] . . . element in wanting to get these young girls pregnant that ties in to the . . . Burke testimony, both in his efforts to try to be sexually active with her, wanting to be her teacher and getting protective of her or possessive of her and angry that she wasn't staying as close as he wanted to. So I do see that there are—although they are not identical, there is sufficient similarity here to make the testimony about . . . [Helen] and her relationship with [Carter] relevant and not so unduly remote in time as to be prejudicial under [Evidence Code section] 352."

The court also explained: "One other thing on the [Evidence Code section] 1108 weighing is that if this were really dissimilar conduct, if this were, for example, a case of indecent exposure or some sort of sexual impropriety with a substantially older person or something like that, that would have weighed in my determination that it was too remote in time, but I think given the similarities, the remoteness is not an issue. I just wanted to explain that."

As to Helen's proposed testimony concerning Carter and her friend Priscilla, the court stated: "This one is a closer case because we don't really have a lot of information here. I think that I would have to have [an Evidence Code section] 402 [hearing] on exactly what [Helen] saw, what the basis was for her belief that the child—the other person was 15 to 16, whether she knew the person, whether they were dressed, whether they weren't dressed, and what the circumstances were." The court explained further: "[W]ithout that information, I don't think I know enough now to hold that it is probative.

10

It's also remote in time and the probative value is not as strong because we just don't know anything about the circumstances. So we're asking to make all kinds of inferences about the circumstances as to something that's quite old. An so I think unless you are able to make some showing of some of these facts, I think that this is going to have to stay out."

On December 13, 2012, the trial court held an Evidence Code section 402 hearing, for the purpose of hearing Helen's testimony concerning her friend Priscilla. After hearing that testimony, the court held that Helen's evidence concerning Priscilla was admissible under Evidence Code section 1108: "I think given what . . . [Helen] has said, for many of the reasons that [the People] stated, this is squarely within [Evidence Code section] 1108.

"The instruction will be given as to the 1108 evidence under CALCRIM [No.] 1191 that the jury may consider this evidence only if the people have proved by a preponderance that the defendant, in fact, committed the uncharged offenses.

"It's up to the jury to determine whether this is, in fact, [an] enumerated offense. And we will give an instruction at the time about what the elements are so that the jury can determine, in accordance with the law, as to whether there was—this is the kind of conduct that would meet [section] 647.6, or, for that matter, [section] 288, or a statutory rape if the jury could also infer that the used condom—or that condom in the toilet was a used condom and under the circumstances was from sexual contact between these two.

"They don't have to, but they certainly can. I'm not going . . . to make that determination. That's up to the jury.

"The jury instructions sufficiently protect the defendant, so the jury will be focused on those issues. But this is very much part of a pattern now between the conduct alleged in this case, the conduct that will be testified to by the other witness, . . . Burke. It is a pattern of similar conduct, and I think that under the statute it is relevant. I don't think there's any undue prejudice under [Evidence Code section] 352; therefore, it will come in."

11

## C. *Helen Y.'s Testimony Concerning Herself and Carter*

Carter argues that "[t]he [Helen] evidence was too remote, dissimilar to the charged offenses, and more prejudicial than probative.

"Remoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offenses.' [Citation.] In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However . . . significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' [Citation.] Put differently, if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch*).) "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*Id.* at p. 284.) Time periods much more remote than the 16 years at issue here[5] have been permitted by courts when the prior and charged offenses are sufficiently similar. (See *id.* at p. 284 [30 years]; *People v. Hernandez* (2011) 200 Cal.App.4th 953, 968 [40 years].)

Helen's relationship with Carter was dissimilar to the charged offenses in that Helen was older than Jane 1 when Carter began molesting Jane 1. They were also dissimilar in that Helen gave no indication that Carter used force or violence in the prior offense. Carter stresses these differences, but ignores substantial similarities. As with Jane 1, there was a significant difference between Helen's and Carter's ages. Helen testified that after she and Carter began a sexual relationship, she became pregnant and Carter married her after she turned 18. This significantly parallels Jane 1's testimony that the last time she had sex with Carter he did not use a condom, told her they would marry when she turned 18, and that they would have a baby.

Helen's testimony concerning herself and Carter was also not unduly prejudicial under Evidence Code section 352. " ' "Prejudice" as contemplated by [Evidence Code]

---

[5] It was approximately 16 years between the time when Carter initiated sexual relations with Helen and the time when which Carter began molesting Jane 1.

section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice . . . . " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*Branch*, *supra*, 91 Cal.App.4th at p. 286.) Here, that Helen testified to facts that would constitute statutory rape on Carter's part when she was 17 years old, with no intimation that force or violence were involved, was unlikely to evoke an emotional bias against the defendant.

The record shows that the court carefully considered the factors of remoteness, similarity, and prejudice. The court's conclusions that similarity balanced out remoteness and that Helen's testimony was not unduly prejudicial were well within the bounds of reason. (See *Medical Board of California v. Chiarottino* (April 15, 2014, A138420) 2014 Cal.App. LEXIS at *5 ["An abuse of discretion is found where a court exceeds the bounds of reason in light of the circumstances under consideration."].) We find no abuse of discretion.

**D.** *Helen Y.'s Testimony Concerning Carter and Priscilla*

For the sake of argument, we assume that the court erred by allowing Helen to testify concerning Carter and Priscilla. Assuming also that, as Carter urges, we evaluate prejudice using the *Chapman* test, we must determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 22-24.) Accordingly, we consider whether there is a reasonable doubt that, absent the testimony about Priscilla, the jury would have reached the same conclusion concerning Carter's guilt.

Because what actually occurred between Carter and Priscilla is not clear, we have no doubt that the jury gave little weight to the testimony about Priscilla. Carter

13

characterizes his case as one that rested "solely on the victim's word against the defendant's denial of guilt"; one in which " 'the scales of justice are . . . nearly at balance' "; and one in which "[t]he evidence against Carter was not overwhelming." To the contrary, the testimony of Jane 1, Jane 2, Burke, and Helen concerning herself was more than sufficient for the jury to conclude that Carter was guilty. That testimony, in contrast to the testimony about Priscilla, was quite detailed. Nothing in the cross-examination of these witnesses, or the testimony of other witnesses, served to impeach their accounts.

The testimony of Jane 1 was especially compelling. She testified in detail about how Carter put his hands on her vagina when she was 12 years old, how he forced her to kiss him on the lips, and how he raped her when she was 14. Carter's close relationship with Jane 1, his insistence that she wear his rings, his sleeping with Jane 1 in his room behind a locked door, and the fact that he referred to her as his wife were corroborated by Jane 2, Burke, and the defense witness, Junior. The testimony of Jane 2 and Burke about Carter's misconduct toward them lent credibility to Jane 1's testimony. The jury heard about Jane 1's hysterical reaction to Carter's phone call after he was arrested and served with a restraining order. There is no basis on which to entertain a doubt that, absent the testimony about Priscilla, the jury would have reached the same conclusion as to Carter's guilt.

## II. *The Award for Noneconomic Damages*

Carter maintains that when the court awarded Jane 1 $600,000 in noneconomic damages, the court exceeded its legal authority because it did not limit the harm to that caused by violations of section 288.

## A. *Standard of Review*

The California Constitution states: "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer. [¶] (B) Restitution shall be ordered from the

convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const. art. I, § 28, subds. (b)(13)(A)-(B).)

Penal Code section 1202.4, subdivision (f), implements the right to restitution, providing in relevant part: "Except as provided in subdivisions (q) and (r), in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." Section 1202.4, subdivision (f)(3) provides a non-exhaustive list of "economic losses" that may be included as part of a restitution order, including "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." (§ 1202.4, subd. (f)(3)(F).) Thus, noneconomic losses resulting from violations of Section 288 are, as a matter of law, regarded as economic damages.

We review a restitution order for abuse of discretion. (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." (*People v. Dalvito* (1997) 56 Cal.App.4th 557, 562.)

## B. *Background*

Carter was convicted of two counts of felony violation of section 288 against Jane 1 and 10 counts of other sexual offenses against her that occurred when she was 14 years of age or older. The People sought noneconomic damages of $600,000 for Jane 1 and the court held a hearing on the matter. Carter argued that he had no money and had no prospect of ever being able to pay anything, having been sentenced to 110 years in prison and having no prospects of a later inheritance. He told the court that any award for noneconomic damages would be a "hollow award."

The court rejected Carter's argument that his inability to pay was a factor to be considered. The court then approved the request for $600,000 in damages for Jane 1, stating: "I think that the amount that the People are requesting here is within the reasonable range, and I'm looking mostly at what happened to the girls in the past.

What's the compensation for being raped every weekend when [you are] 14 or 15 or 16? What is that worth? [¶] And, you know, if you value it and say $2,000 a weekend, it's not an unreasonable evaluation. It comes to about $600,000 a year for the number of weekends we're talking about here."

Carter made no objection to the reasoning by which the court found $600,000 to be appropriate.

## C. *Forfeiture*

The People contend that Carter has forfeited this issue on appeal because he did not raise an objection in the trial court that the court based its award for noneconomic damages on his behavior (raping Jane 1 every weekend for a number of years) that was not chargeable under section 288. Carter did not file a reply brief and did not address the issue of waiver in his opening brief.

In support of their forfeiture argument, the People cite *People v. Scott* (1994) 9 Cal.4th 331, 353 (the forfeiture doctrine applies to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices), and *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468 (failure to object to a restitution fine on procedural grounds waives the objection). Neither of these cases is directly on point because the court's duty to find a factual and rational basis for a restitution order is not a discretionary sentencing choice and is not a matter of procedure.

Notwithstanding any possible forfeiture, we exercise our discretion to consider Carter's claim because the People have not adequately supported their argument for forfeiture. (See *People v. Bryant* (2013) 222 Cal.App.4th 1196, 1202 [exercising discretion to consider issue, despite possible forfeiture].)

## D. *The Court Did Not Abuse its Discretion*

Both Carter and the People rely on *People v. Smith* (2011) 198 Cal.App.4th 415 (*Smith*). In *Smith*, the defendant digitally penetrated the victim's vagina when she was eight years old. (*Id.* at p. 420) The defendant babysat the victim while the victim's mother worked and molestation occurred " '[b]asically every day' " that they were alone together. (*Id*. at pp. 420-421) The defendant began to orally copulate the victim when

she was 14 and began to penetrate her with his penis when she was 16. (*Id.* at p. 421.) From that age, penetration with the penis occurred almost every day. (*Ibid.*) After the victim turned 18, she moved out of her mother's house, but the defendant continued to visit her and had sexual relations with her until the victim was 26. (*Id.* at p. 421.) A jury convicted the defendant of one count of committing a lewd act on a child under 14 (§ 288, subd. (a)), and one count of continuous sexual abuse between August 11, 1988 and August 9, 1993 (§ 288.5). (*Smith*, at pp. 419-420.)

The court awarded the *Smith* victim $750,000 in noneconomic damages. (*Smith*, *supra*, 198 Cal.App.4th at p. 420.) "The trial court agreed that it was in the 'unenviable' position of quantifying [the victim's] psychological harm in dollars. Searching for a way to proceed, the court noted that defendant's acts against [the victim] occurred over a 15-year period, from age eight to age 23. The court multiplied that 15 years by $50,000 per year, thus arriving at the $750,000 requested by [the victim]." (*Id.* at p. 433.)

On appeal, the defendant in *Smith* argued that the trial court abused its discretion by basing the victim's suffering on years after the crimes for which he was convicted were committed. (*Smith*, *supra*, 198 Cal.App.4th at p. 435.) The court rejected the defendant's argument: "In determining how to fix an amount of noneconomic damages, the trial court expressed its willingness to base the award on 15 years of abuse by defendant. Multiplying that 15 years by $50,000, the court arrived at the figure requested by Doe—$750,000 for noneconomic damages. Defendant asserts that this was an abuse of discretion because he was convicted of only seven years of abuse, ending when Doe turned 15 years old. We are not concerned by the court's statements in making the award. As would a jury, the court was searching for some way to quantify Doe's pain and suffering. And there is no credible argument, especially on the facts of this case, that Doe's psychological harm ended when she was 15 years old. Accordingly, the court did not abuse its discretion." (*Id.* at p. 437.)

Carter concedes that Jane 1 may "be compensated for suffering that she experienced past the age of 14 for offenses that occurred before that age. The harmful consequences of a sexual offense may live with the victim for years after the offense

17

itself." However, Carter distinguishes his case from *Smith* by arguing that the trial court in his case "expressly based the restitution amount on sexual offenses that were not section 288 violations, and which, because they occurred after Jane turned 14, could not have been charged as section 288 violations." Carter argues further: "In *Smith*, the defendant was charged and convicted of only two counts: a lewd act under section 288, and continuous sexual abuse under 288.5. All of the acts giving rise to the offenses occurred before the victim was 14 years [old]. [Citation.] However, the evidence at trial also showed a number of uncharged offenses, specifically sexual intercourse and oral copulation with the victim until she was 26 years old."

The People argue, on the other hand: "Jane 1's pain and suffering did not end when she turned 14 years old. As the *Smith* court said, '[T]here is no credible argument, especially on the facts of this case, that [Jane 1's] psychological harm ended when she was 15 years old.' [Citation.] [¶] [Carter] argues that the trial court improperly based the noneconomic damages amount on offenses other than violations of Penal Code section 288 because the trial court said at the restitution hearing, 'What's the compensation for being raped every weekend when you're 14 or 15 or 16? What is that worth?' [Citation.] As the *Smith* court stated, 'We are not concerned by the court's statements in making the award. As would a jury, the court was searching for some way to quantify [Jane 1's] pain and suffering.' [Citation.] For the same reasons, the trial court did not err or abuse its discretion in this case."

We disagree with Carter that there is any significant difference between the reasoning of the trial court in *Smith*, which based its calculation of noneconomic damages, on "defendant's acts against [the victim that] occurred over a 15-year period, from age eight to age 23," (*Smith*, *supra*, 198 Cal.App.4th at p. 433) and the reasoning of the trial court here, which based its calculation on Carter's rapes of Jane 1 that occurred when she was 14, 15 and 16 years old. Contrary to Carter's argument, both courts considered behavior of the defendant that occurred after the victim was 14 years of age and, thus, could not have been charged as violations of section 288.

18

We do not find *Smith* to be distinguishable on the matter of how the court determined that a particular amount of noneconomic damages was reasonable. We agree with *Smith* that, "[w]e are not concerned by the court's statements in making the award. As would a jury, the court was searching for some way to quantify [the victim's] pain and suffering." (*Smith*, *supra*, 198 Cal.App.4th at p. 437.) On the facts of this case, there is no credible argument that Jane 1's psychological harm ended when she reached the age of 14. To the contrary, that harm was increased by subsequent acts that we believe were reasonably foreseeable to Carter when he began his molestation of Jane at age 12. The amount of the award in this case does not shock the conscience or suggest prejudice or corruption. (See *id.* at p. 436.) There was a factual and rational basis for the award. The trial court did not abuse its discretion.

## DISPOSITION

The judgment and the amount of the restitution order are affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19